# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52570-4-II |
| Appellant, | |
| vs. | PUBLISHED OPINION |
| TOMMY ROSS, JR., a.k.a. TOMMY McDONALD, TOMMY CARTER, TOMMY WALLACE, MARVIN JOHNSON, ANTHONY JOHNSON, | |
| Respondent. | |

MAXA, C.J. – Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to a speedy trial, which is a fundamental constitutional right. *State v. Iniguez*, 167 Wn.2d 273, 281-82, 217 P.3d 768 (2009). The United States Supreme Court has made clear that "the primary burden" falls "on the courts and the prosecutors to assure that cases are brought to trial." *Barker v. Wingo*, 407 U.S. 514, 529, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). If the State violates a defendant's speedy trial right, we have no choice but to dismiss the charges no matter how horrendous the charged crimes may be. *See Iniguez*, 167 Wn.2d at 282.

Here, the State charged Tommy Ross in Clallam County with aggravated first degree murder in 1978. But the State did not pursue prosecution of that charge for over 38 years. Instead, the State allowed Ross to be extradited to Canada for trial on another murder charge

without ensuring that he would be returned for trial in Clallam County. And then while Ross was incarcerated in Canada the State made no meaningful effort for decades to obtain his return to the United States for trial.

The trial court ruled that the State violated Ross's constitutional right to a speedy trial by not prosecuting the murder charge against him for over 38 years, and the court dismissed that charge. Applying the four-part balancing analysis set out in *Barker*, we also conclude that the extraordinary delay in prosecuting Ross violated his speedy trial right. Accordingly, we are constrained to affirm the trial court's dismissal of the murder charges against Ross.

FACTS

*Arrest, Removal to Canada, and Conviction*

On June 10, 1978, the State charged Ross in Clallam County with aggravated first degree murder, and the court issued a warrant for his arrest. Ross was accused of the April 24, 1978 killing of a woman in Port Angeles. Canadian authorities also had issued a warrant for Ross's arrest for the May 14 murder of a woman in Victoria, British Columbia. Law enforcement in Los Angeles arrested Ross in December 1978 on both warrants as well as on California attempted rape and burglary charges.

Clallam County prosecuting attorney Craig Ritchie left office on January 8, 1979 and was replaced by Grant Meiner. In a meeting before Meiner took office, Ritchie informed Meiner that "under no circumstances, should he relinquish the County's jurisdiction over [Ross] and let him go to Canada to stand trial first" on the Canadian murder charge. Clerk's Papers (CP) at 484-85. Ritchie gave Meiner all the reasons he could think of why Canada would never return Ross and advised Ritchie in strong terms that Clallam County should try Ross first before letting Canada take him.

Detective Robert Vail of the Port Angeles police department interviewed Ross in jail in Los Angeles on January 10, 1979. Ross denied ever meeting the murdered woman. Vail did not ask Ross to waive extradition from California to Washington.

The next day, an officer from the Victoria police department interviewed Ross in jail. Ross denied any involvement with the Victoria murder and signed an extradition waiver stating that he would voluntarily agree to return to Canada to face prosecution. At the time of his waiver, Ross was illiterate and unrepresented.

On January 11, Victoria crown counsel[1] Richard Anthony called Meiner to inform him that Ross had agreed to waive extradition to Canada. Anthony stated that California authorities would not release Ross to Canada without Clallam County's consent. Meiner memorialized this conversation in a memorandum. The memorandum conveyed that Meiner had spoken with Anthony, who stated that Ross would be "ejected" from Canada after his trial there and that Anthony would obtain a waiver of extradition to Clallam County from Ross. CP at 208.

Anthony then telegraphed Meiner to inform him that Ross was deportable from Canada as a fugitive from justice on the Clallam County warrant. The telegraph added that Ross was detainable on a deportation warrant "if charges in Victoria fail." CP at 210.

Later the same day, Meiner informed California authorities that Clallam County authorized them to release Ross to Canadian authorities. Ross was flown to Victoria the next day.

Meiner later stated that he was "open to allow the prosecution of Mr. Ross for murder in Victoria to precede the murder prosecution in Clallam County" because he believed the evidence

---

[1] "Crown counsel" in Canada apparently is the equivalent of a deputy prosecutor in Washington.

3

against Ross in the Victoria case was stronger. CP at 202. Meiner hoped that the evidence of a prior conviction of a very similar murder in Victoria would increase the chances of convicting Ross in Clallam County. Meiner "concluded that the prosecution in the Port Angeles case would benefit by waiting until after the conclusion of the Victoria trial." CP at 203.

Ross ultimately was convicted of murder by a Canadian court on July 13, 1979. He was sentenced to life in prison, with a minimum incarceration of 25 years before he was eligible for parole.

*Appointment of Public Defender*

In May 1979, Clallam County public defender Christopher Shea requested that his office be appointed on an interim basis to represent Ross in the Clallam County case. Shea attempted to obtain discovery from the State and gather other information about the case.[2] The State refused to provide Shea with discovery because by rule the State was not required to produce discovery until the omnibus hearing, and no omnibus hearing had yet been held because Ross was still in Canada. The trial court declined to require discovery.

*Initial Attempts to Return Ross to Washington*

In June 1979, Meiner wrote to crown counsel Richard Law and stated that Anthony had agreed to deliver Ross to Clallam County immediately after the conclusion of the Victoria trial. Meiner stated his understanding that Ross would be deported regardless of the outcome of the trial.

J.W. Anderson, regional crown counsel, replied to Meiner's letter and informed him that Anthony no longer was employed by the Ministry of Attorney-General and that Anthony's

---

[2] Later, Shea could not recall that his office ever had direct contact with Ross or that the office ever advised Ross on the Clallam County murder charge.

4

apparent assessment of Ross's case "seems to have been based upon an over-simplification of the situation and its ramifications." CP at 219. Anderson further stated that because Ross was convicted and sentenced in Canada, there were no legal means to return him to the United States while his sentence was being served.

Meiner wrote to crown counsel Law again in August, stating that he planned to request extradition of Ross. Meiner acknowledged the crown counsel's position that "since Ross has been convicted in Canada, he may not be extradited . . . until he has served at least one-third of his sentence in Canada," but he set out his opinion that extradition treaties allowed for Ross's extradition to the United States. CP at 221.

In October, Meiner spoke on the telephone to Digby Kier, counsel with the Canada Department of Justice, and stated that he wanted to extradite Ross to Clallam County to face a murder charge. Kier responded that Ross was not eligible to be extradited until he had served the 25-year minimum of his sentence. Kier enclosed a decision of the British Columbia Supreme Court holding in a similar case that a prisoner serving a sentence could not be extradited until that sentence was completed. He noted that Ross might be deported to the United States once Canada paroled him.

In February 1980, Meiner wrote to Kier following up on the extradition issue. Kier said that immigration authorities had informed him that after a convicted person was released on parole he would be deported. In contrast, if Clallam County obtained an extradition order, "he would have to serve the full term of the sentence in Canada" before being transferred to the United States. CP at 242. Kier concluded, "I feel that deportation rather than extradition would be the quickest way to have Ross received in your Country." CP at 242.

Meiner later stated that his thinking was that if he obtained an extradition order, Ross would have to serve the full term of his sentence in Canada before being released to the United States. But he concluded that "if my office did not seek extradition, Mr. Ross could possibly receive an earlier parole and would then be subject to deportation." CP at 205.

In April 1981, Port Angeles's police chief wrote to Meiner to inform him that a recent case holding that Washington's death penalty was unconstitutional seemed to remove one of the obstacles to obtaining Ross's return from Canada.[3] He requested that all efforts be made to extradite Ross to prosecute him for the charged murder.

Meiner responded that if he obtained an extradition order, Ross would have to serve 25 years in Canada before he could be extradited. But if he did not obtain an extradition order, Ross could be paroled sooner. Meiner concluded that he was "not presently inclined" to seek extradition. CP at 300.

*Subsequent Developments*

In May 1987, Ross applied for a transfer to a prison in the United States. Canadian authorities approved the transfer in December.

In response to Ross's apparent desire to return to the United States, the State moved in November 1987 to quash the outstanding warrant for his arrest in Clallam County and the warrant was quashed.[4] The Clallam County prosecuting attorney serving at that time was concerned that Ross's "reappearance here may force a premature decision regarding the prosecution." CP at 246. He also stated that "two material witnesses are not now available – one

---

[3] Apparently, Canada generally would not extradite prisoners if they were subject to the death penalty in the United States.

[4] The arrest warrant was reinstated in 1988.

has disappeared, the other is dead, and the primary investigator from the Port Angeles Police Department is no longer with the police department." CP at 247.

In June 1988, Ross appeared at a hearing in a Canadian prison before a United States magistrate judge regarding his transfer request. The magistrate judge advised Ross that he had charges pending against him in the United States. Ross said that he understood and recognized that he might have to address the charges if he returned to the United States. The judge stated that a van was available to take him to the United States that day. Ross stated that he wished to be transferred to a prison in California, but the judge cautioned that his wish likely would not be accommodated. Ross responded that he might as well stay in Canada because he could not see his family either way. Ross decided not to proceed with the transfer.

In March 1994, Ross wrote to the Port Angeles Police Department, requesting that the department inform him whether he had any outstanding charges in Clallam County. Ross also requested all information relating to the death of the murdered woman. The record does not include the response, if any, Ross received.

In 2002, Sylvie Bordelais, a Canadian lawyer representing Ross, wrote to the Port Angeles Police Department and asked "whether there is a procedure to have [Ross] brought back to the United States to face the charges related to some outstanding arrest warrants in [Clallam] County." CP at 276. The police department referred Bordelais to the Clallam County prosecuting attorney in office at the time, Deborah Kelly.

Bordelais called Kelly sometime in 2003 to say that Ross would like to return to the United States if Kelly would take the death penalty "off the table." CP at 274. Although Kelly was not certain whether the death penalty was a viable option in Ross's case due to recent changes in the law, she told Bordelais that if the death penalty was viable, she would not remove

7

it. Kelly later stated, "I was not enthusiastic about the idea of bringing back a cold twenty-five year old murder case" because of recent budget cuts. CP at 273.

In 2008, Ross's second application for a transfer to a prison in the United States again was approved. His attorney advised Ross against transferring because it was possible that upon return to the United States, Ross could be incarcerated in federal prison far away from his mother in California and because he would fare better seeking parole in Canada rather than in the United States. Ross ultimately withdrew the transfer request, stating that "[m]y efforts now are focusing on that of realizing a full parole for deportation to the U.S." CP at 284.

Nothing in the record shows that during his incarceration in Canada, Ross ever made a formal request that he be returned to Clallam County to face the first degree murder charge.

In February 2014, the State moved to quash any existing arrest warrant for Ross on the murder charge because of the age of the case (at that time, 36 years) and the fact that "witnesses and physical evidence may be difficult to pull together for trial." CP at 401. The trial court issued an order quashing the warrant.

In 2016, the Canadian parole board scheduled a hearing to consider paroling Ross. Clallam County prosecutors sent a letter to the Canada corrections service with a copy to the parole board recommending against his release and encouraging Ross's continued confinement in Canada.

*Clallam County Prosecution*

The Canadian parole board released Ross from prison in November 2016 and Canada deported him on November 15. The same day, Ross was taken into custody at the United States border.

Ross first appeared in Clallam County Superior Court on November 16, and the trial court found probable cause for Ross's arrest and the filing of the information. The court set bail at $1.5 million. Ross's arraignment came approximately 38 and a half years after he was first charged with murder. In April 2017, the State amended Ross's information, charging one count of first degree murder, one count of second degree murder, and one count of first degree felony murder.

Trial was continued several times on the motions of both parties. The first continuance moved the trial from January 30, 2017 to August 28, 2017 by agreement of the parties because of the extensive evidence in the case. In June, the State moved to continue trial again because it was awaiting the completion of DNA testing on crime scene evidence. The trial court set a new trial date of March 19, 2018. In February 2018, Ross moved to continue the trial, citing the Victoria Police Department's refusal to turn over unredacted police reports, receipt of the recent DNA testing results, and the defense's desire to obtain police reports from the Whatcom County Sheriff related to Ross's arrest at the border. The trial was continued to October 1, 2018. On August 14, the trial was continued a fourth time from October 1 to March 19, 2019 to allow Ross's new second chair defense attorney to become familiar with the case.

During this time, both parties filed numerous pretrial motions. These included motions to admit or exclude evidence, to request additional findings from CrR 3.5 hearings, perform DNA testing, to appoint experts, to remove restraints, to file an amended information, to dismiss the case based on governmental misconduct under CrR 8.3(b), to evaluate Ross for competency and provide him with psychiatric services, and to compel discovery.

On August 27, 2018, Ross moved to dismiss all charges on speedy trial grounds. The motion was filed over 21 months after Ross was arraigned.

On October 17, the trial court granted the motion to dismiss in a memorandum opinion. The trial court concluded that the 38-year delay was "extraordinary," and "long enough to be considered presumptively prejudicial." CP at 55-56 (internal quotation marks omitted). The court rejected the State's argument that Ross failed to assert his speedy trial right by signing a waiver of extradition to Canada. The court also determined that the defense was greatly impaired by the passage of time, noting the loss of evidence and faded memories or deaths of witnesses in the intervening years.

Finally, the trial court found that the reason for the delay was that no Clallam County prosecuting attorney ever sought Ross's extradition from Canada, but instead hoped that Ross would return voluntarily. The court noted that treaties between the United States and Canada made Ross's extradition possible and concluded that the State did not exercise due diligence to pursue prosecution resulting in a violation of Ross's speedy trial right. The trial court stated, "The reason for the delay in this case is that Clallam County through its prosecuting attorney chose to defer prosecution of Mr. Ross in favor of first sending him to a foreign country." CP at 64.

The trial court entered findings of fact and conclusions of law to support its decision. The court also signed an order dismissing all charges against Ross with prejudice based on a violation of Ross's speedy trial right. The State appeals the dismissal of Ross's murder charges.

ANALYSIS

The State argues that Ross's constitutional right to a speedy trial was not violated by the 38-year delay in bringing him to trial on the murder charge because the delay was primarily attributable to Ross. We disagree.

A.    LEGAL PRINCIPLES

The analysis for the speedy trial right under article I, section 22 is substantially the same as the analysis under the Sixth Amendment. *State v. Ollivier*, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). We review de novo whether a defendant's constitutional right to a speedy trial has been violated. *Id.*

Significantly, the Court in *Barker* made clear that "the primary burden" falls "on the courts and the prosecutors to assure that cases are brought to trial." 407 U.S. at 529. "A defendant has no duty to bring himself to trial." *Id.* at 527. "[T]he affirmative burden is on the state, not on the defendant, to see that a trial is held with reasonable dispatch." *State v. Sterling*, 23 Wn. App. 171, 173, 596 P.2d 1082 (1979).

We use the balancing analysis stated in *Barker* to determine whether the defendant's constitutional right to speedy trial was violated. *Ollivier*, 178 Wn.2d at 827. "Among the nonexclusive factors we consider are the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *Id.* (quoting *Barker*, 407 U.S. at 530). None of these factors alone is sufficient or necessary to find a violation, but they assist in determining whether the speedy trial right was violated. *Ollivier*, 178 Wn.2d at 827.

The speedy trial analysis is fact-specific and depends on the particular circumstances of the case. *Id.* We must assess the conduct of both the State and the defendant in weighing the *Barker* factors. *Id.*

B.    *BARKER* BALANCING ANALYSIS

1.    Threshold Determination

To trigger the analysis under *Barker*, the defendant must make a threshold showing that the time between the filing of charges and trial exceeded the ordinary interval for prosecution

and crossed into presumptively prejudicial delay. *Ollivier*, 178 Wn.2d at 827 (citing *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). The court then considers " 'the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.' " *Ollivier*, 178 Wn.2d at 828 (quoting *Doggett*, 505 U.S. at 652). In other words, the length of the delay is both the trigger for the *Barker* analysis and the first factor in that analysis. *Ollivier*, 178 Wn.2d at 828.

The court in *Ollivier* stated that the eight-year delay the United States Supreme Court addressed in *Doggett* "was clearly sufficient to trigger the speedy trial inquiry." *Id.* In *Ollivier*, the State conceded that a 23-month delay was sufficient. *Id.* In fact, the court in *Ollivier* agreed with the statement in *Doggett* that courts generally have held that delay is presumptively prejudicial where it approaches one year. *Id.*

Here, almost 38 years passed between Ross's arrest and his first appearance in the trial court on the Clallam County murder charge. The extraordinary length of the delay triggers the *Barker* analysis.

2.    Length of Delay

The first *Barker* factor is the length of the delay. *Ollivier*, 178 Wn.2d at 827, 828. The State argues that the 38-year delay here is less significant to the *Barker* analysis because the delay was attributable to Ross's conduct and to Canada's decision to keep Ross until he served his sentence. We conclude that the length of the delay here is significant and weighs against the State.

The constitutional right to a speedy trial is not measured by a fixed time period. *Barker*, 407 U.S. at 529. The court in *Ollivier* stated that courts in numerous cases have not considered even extensive delays as exceptionally long, "particularly when the delay was attributable to the

defense." 178 Wn.2d at 828. The court cited multiple cases from other jurisdictions where the courts found no speedy trial violations for delays ranging from 21 months to over four years when the delays were attributable to the defendants. *Id.* at 828-30 & n.6.

Here, the State focuses on why the delay occurred. But these arguments relate to the second *Barker* factor, the reason for the delay. That factor is discussed below. Regardless of the reason, we cannot ignore that a delay of 38 years is unprecedented in speedy trial cases. The Court in *Doggett* referred to an eight-year delay as "extraordinary." 505 U.S at 652. The Court in *Barker* also referred to a five-year delay as "extraordinary." 407 U.S. at 533. The 38-year delay here far exceeds those delays. This extraordinary delay necessarily is significant to the speedy trial analysis. We conclude that the length of delay factor weighs heavily against the State.

### 3. Reason for Delay

The second *Barker* factor is the reason for the delay. *Ollivier*, 178 Wn.2d at 827, 831. The State argues that this factor should weigh in its favor because it was not at fault for Canada's refusal to transfer Ross back to Clallam County and for Ross's lengthy incarceration in Canada. The State claims that the primary reasons for the 38-year delay were Ross's commission of crimes in different jurisdictions, Canada's refusal to return Ross to the United States, and Ross's decision not to transfer to a United States prison. The State also claims that it was not negligent in releasing Ross to Canada and failing to secure his return. We conclude that the reason for delay factor weighs against the State.

The reason for delay factor focuses on "whether the government or the criminal defendant is more to blame" for the delay. *Doggett*, 505 U.S. at 651. "A court looks to each party's responsibility for the delay, and different weights are assigned to delay, primarily related

to blameworthiness and the impact of the delay on defendant's right to a fair trial." *Ollivier*, 178 Wn.2d at 831. The State's deliberate delays will be weighed heavily against it, but even negligence that causes delay will be weighed against the State. *Id.* at 832.

The reason for the delay is the focal point of the balancing analysis. *Ollivier*, 178 Wn.2d at 831. Although all the *Barker* factors are relevant to the speedy trial analysis, "the second factor – who is more to blame for the delay – often dictates the outcome of cases." *United States v. Fernandes*, 618 F. Supp. 2d 62, 67 (D.D.C. 2009).

a. Prosecuting Attorney Allowing Release of Ross to Canada

Meiner's decision to release Ross to Canada was the root cause of the speedy trial issue. California would not have released Ross to Canada without Clallam County's consent. And California was willing to drop its charges and send Ross to Clallam County for trial on the murder charge. Therefore, but for Meiner's decision, Ross would have been available in Clallam County for a speedy trial. The question here is whether that decision was negligent.

Standing alone, Meiner's decision was not necessarily unreasonable. But Meiner's predecessor had cautioned him before taking office not to relinquish custody of Ross to Canada because they would never return him. In a similar situation, one court stated, "[E]ven if acting under the mistaken belief that defendant's presence could be obtained in [the United States] promptly after the Canadian trial, the [State] still knew or should have known that there was no guarantee that defendant would be brought back to [the United States] in a timely manner." *People v. Romeo*, 12 N.Y.3d 51, 57, 904 N.E.2d 802 (2009).

In addition, Meiner was negligent in conjunction with that decision in failing to either (1) secure a formal, enforceable agreement from Canadian authorities that Canada would return

14

Ross after the Victoria trial regardless of the outcome, or (2) determine whether Ross's return was likely under Canadian law once he had been convicted and sentenced.

First, Meiner thought he had an oral agreement with crown counsel Anthony that Ross would be returned to Clallam County after the Victoria trial. But Meiner never obtained a formal agreement to return Ross. Anthony did send a telegram, which Meiner interpreted to mean that Ross would be returned to the United States regardless of the outcome of his trial. But in fact, the telegram stated that Ross could be deported from Canada "*if* charges in Victoria fail." CP at 210 (emphasis added).

Further, Meiner was dealing with the equivalent of a deputy prosecutor who was handling the Victoria murder case. He did not obtain assurances from crown counsel that he had authority to bind the Canadian government or attempt to talk with people in the Canadian government who might have greater authority over extradition matters.

Second, Meiner failed to confirm that Canadian law even allowed Ross to be returned to the United States after he was convicted and sentenced. After Ross was convicted, Canadian authorities informed Meiner that under a British Columbia Supreme Court decision, Ross could not be returned to the United States until he had served 25 years of his sentence. Meiner should have researched Canadian law before agreeing to release Ross to Canada.

We conclude that Meiner's decision to release Ross to Canada without obtaining an enforceable agreement to return him to Clallam County was negligent and weighs against the State.

   b. State Failing to Request Extradition

Ross argues that the State was negligent in failing to request extradition once Ross was incarcerated in Canada, particularly after the extradition laws changed. The State claims that any request for extradition would have been futile.

The general rule is that when a defendant is incarcerated outside of the country, the State has a constitutional obligation for speedy trial purposes to make a good faith, diligent effort to secure his or her return to the United States for trial. *See Smith v. Hooey*, 393 U.S. 374, 383, 89 S. Ct. 575, 21 L. Ed. 2d 607 (1969); *United States v. Pomeroy*, 822 F.2d 718, 721-22 (8th Cir. 1987); *United States v. McConahy*, 505 F.2d 770, 773 (7th Cir. 1974); *United States v. Blake*, 817 F. Supp. 2d 1082, 1085 (N.D. Ind. 2011); *see also Doggett*, 505 U.S. at 656 ("[I]f the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail.").

> The fact that a defendant is incarcerated outside of the state makes it incumbent upon the [State] to make diligent, good faith efforts to secure his presence in the state for arraignment and trial (*see Hooey*, 393 U.S. 374, 383 [1969]). Where the defendant is incarcerated in another country, failing to make an extradition request has been one factor that courts have viewed as evidencing a lack of diligent efforts on the part of the prosecution in bringing [the] defendant to trial promptly.

*Romeo*, 12 N.Y.3d at 57.[5] Efforts other than a formal extradition request also may satisfy the State's obligation. *United States v. Walton*, 814 F.2d 376, 379-80 (7th Cir. 1987).

---

[5] *Smith* and *McConahy* expressly state that this rule applies only if the defendant demands that the State make an effort to return him or her for trial. *Smith*, 393 U.S. at 383; *McConahy*, 505 F.2d at 773. But other cases state the rule without reference to the defendant's demand. *See Pomeroy*, 822 F.2d at 721-22; *Romeo*, 12 N.Y.3d at 57. And some cases hold that an obligation to make a diligent effort to return the defendant for trial applies even if the defendant is a fugitive. *See, e.g., United States v. Bagga*, 782 F.2d 1541, 1543-44 (11th Cir. 1986).

However, the State has no obligation to make efforts to seek the return of the defendant if such efforts would be futile. *McConahy*, 505 F.2d at 773; *Romeo*, 12 N.Y.3d at 57.

Washington has acknowledged this rule in the context of a defendant incarcerated in another state. *Sterling*, 23 Wn. App. at 173. The State's duty to bring a defendant to trial "includes the requirement that the State make a timely demand for extradition if the accused is being held in another jurisdiction." *Id.*

Here, in 1979 and 1980 Meiner did make some diligent efforts to have Ross transferred to Clallam County. Canadian authorities rebuffed those efforts and suggested that filing an extradition request actually would extend Ross's incarceration in Canada. Any further attempts to obtain a transfer *during that time frame* would have been futile.

However, the State made no further efforts to seek extradition of Ross or otherwise obtain his transfer for the next 36 years. This failure is significant because the extradition treaties between the United States and Canada were amended in 1991 to give the country incarcerating a person the discretion to extradite the person before expiration of his or her sentence. And in 2003 the treaties were amended to allow a person already convicted in one country to be temporarily surrendered to the other country for prosecution and then returned to the first country for the person to serve the remainder of his or her sentence. Canada still had discretion under the amended treaties to deny an extradition request. *See Romeo*, 12 N.Y.3d at 57. But if there was a possibility that Canada would agree to transfer Ross, the State had an obligation to at least inquire. *See Pomeroy*, 822 F.2d at 721-22; *Romeo*, 12 N.Y.3d at 57.

We acknowledge that obtaining extradition from Canada may have been difficult and that the record does not reveal whether an extradition request would have been successful. But we

conclude that the State's failure after 1980 to seek extradition or even inquire about obtaining Ross's transfer to Clallam County weighs against the State.

c.    State's Disinterest in Prosecuting Ross

The record shows that the State had little interest in prosecuting Ross at all, much less in a timely manner.

As noted above, in 1987 the State asked the court to withdraw Ross's arrest warrant when the State learned that Ross might be transferred to the United States. The record indicates that the State was not prepared to try Ross even eight years after charges were filed.

In 2003, an attorney representing Ross suggested that Ross might be interested in returning to Clallam County for trial if the death penalty was not an option. The Clallam County prosecuting attorney refused to commit to not pursuing the death penalty. She later admitted that she was "not enthusiastic" about prosecuting this now 25-year-old case because of recent budget cuts. CP at 273.

In 2014, Clallam County moved to quash the outstanding warrant for Ross's arrest because of the age of the case (at that time, 36 years) and the fact that "witnesses and physical evidence may be difficult to pull together for trial." CP at 401.

Finally, when Ross was being considered for parole in 2016, Clallam County prosecutors sent a letter to the Correctional Service of Canada that was copied to the parole board recommending against his release. The State points out that this opposition to parole did not cause any delay because Canada released Ross anyway. But the State's position suggests that even at this late date it was content to leave Ross in Canada rather than prosecuting him.

The combination of these actions show that the State did not diligently seek to prosecute Ross. We conclude that this disinterest in prosecuting Ross weighs against the State.

d. Ross's Commission of Criminal Acts

The State argues that Ross's commission of a criminal act in Canada and his resulting incarceration there contributed to the delay in bringing him to trial in Clallam County. The State is correct; the speedy trial problem would not have arisen if Ross had not committed a crime in Canada. The State quotes from *Beavers v. Haubert*, where the court noted that when a defendant is charged with more than one crime he might not be able to be tried on all the charges at the same time. 198 U.S. 77, 86-87, 25 S. Ct. 573, 49 L. Ed. 950 (1905). "In a sense the delay resulting from a defendant's imprisonment in another jurisdiction is attributable to him." *McConahy*, 505 F.2d at 773.

We agree that Ross bears some responsibility for the delay because he committed a crime in Canada.

e. Ross Declining Transfer to United States Prison

The State argues that Ross's 1988 and 2008 decisions not to accept approved transfers to a prison in the United States caused the delay in prosecuting him. Ross responds that his reasons for declining to transfer had nothing to do with the Clallam County murder charge and did not cause the delay.

If Ross had transferred to a United States prison, the State would have been in a better position to bring him to trial in Clallam County because no extradition from Canada would have been necessary. In that sense, Ross's two decisions not to transfer were a cause of at least a portion of the delay.

However, three considerations lessen the impact of Ross's conduct. First, Ross's decision not to return to the United States was not a response to any Clallam County attempt to seek his return. The transfer requests were initiated by Ross for personal reasons. In 1988, his

19

goal was to obtain a transfer to a California prison, but he was told that such a transfer was unlikely. And in 2008 he again wanted to be closer to his family in California, but counsel told him that a transfer to a United States prison could affect his ability to obtain parole.

Second, when Ross first requested a transfer in 1987, the State demonstrated that it was not interested in bringing Ross to trial at that time even if he was transferred to the United States. The State moved to quash the outstanding warrant for his arrest in Clallam County because the prosecutor was concerned that Ross's transfer might force a premature prosecution.

Third, when Ross decided in 2008 not to transfer, 29 years already had passed since the murder charge was filed. Even if Ross had transferred at that time, the same speedy trial issues would have been present. Further, when the State had last addressed the issue in 2003, the prosecuting attorney was not enthusiastic about prosecuting the case.

We conclude that regarding the reason for delay factor, Ross's decision not to transfer to the United States only slightly weighs against Ross.

   f. Delay Following Ross's Return

The State argues that Ross's multiple unsuccessful motions to dismiss or suppress evidence and acquiescence in multiple continuances caused almost two years of additional delay once Ross was returned to Clallam County to face the murder charge. The State claims that this delay should be attributed to Ross and should weigh against him.

Here, a period of 21 months elapsed between Ross's arraignment in Clallam County and his motion to dismiss based on the speedy trial right. A number factors contributed to the delays in Ross's case at this stage. Of the four continuances the trial court granted, the State requested or joined at least two for the sake of being better prepared for trial. Both parties filed extensive motions. Although Ross filed multiple motions to suppress or dismiss, the State also filed

20

numerous motions to admit and exclude evidence, to compel discovery, to permit consumptive DNA testing, to perpetuate testimony, to file an amended information, and to continue trial.

Ross arguably could have done more to bring the case to trial sooner. But by that time, 40 years already had passed. And given the case's nearly 40-year history and the multiple pretrial issues, a delay of 21 months was not excessive. The parties and the trial court required this time to sort through the extensive amount of evidence in the case, file and oppose motions, and otherwise prepare for trial. We conclude that the 21-month delay in bringing the case to trial does not weigh against Ross.

g.   Summary

The State's arguments that Ross was the most significant cause of the delay are not persuasive. Ross's conduct did contribute to some extent to the delay. But the primary cause of the delay was the State's decision to release Ross to Canada without obtaining a formal, enforceable agreement to return him and the State's failure to determine whether Canadian law even allowed a transfer after a conviction and sentence. And the State failed to request extradition or even inquire about the possibility of transferring Ross to the United States for 36 years after Meiner's unsuccessful efforts, even when changes in the applicable treaties made the possibility of a successful extradition more probable. Accordingly, we conclude that the reason for delay factor weighs against the State.

4.   Assertion of Speedy Trial Right

The third *Barker* factor is the defendant's assertion of his speedy trial right. *Ollivier*, 178 Wn.2d at 827, 837. The State argues that this factor should weigh against Ross because he never asserted his speedy trial right until 2018 and decided to remain in Canada rather than accept

transfer to the United States and face trial in Clallam County. We agree that this factor weighs against Ross.

"Although a defendant has no obligation to bring himself to trial, he does bear some responsibility in asserting his right." *Sterling*, 23 Wn. App. at 177. In *Barker*, the Court stated, "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532. If the defendant is aware that charges are pending against him and he fails to make any effort to secure a timely trial on said charges, this factor will be weighed against him. *See United States v. Tchibassa*, 371 U.S. App. D.C. 542, 550, 452 F.3d 918 (2006) (stating that a defendant's "failure to make any effort to secure a timely trial" when he knows that charges are pending against him "manifests a total disregard for his speedy trial right").

### a. Arrest and Transfer to Canada

Ross did not demand to be returned to Clallam County for trial after his arrest in Los Angeles and instead waived extradition to Canada to stand trial for his crime. The trial court focused exclusively on this fact in evaluating the assertion of right factor and concluded that Ross's conduct at this time did not waive his speedy trial right. But on appeal the State does not rely on Ross's conduct in California in discussing this factor.

At the time Port Angeles and Victoria police officers came to speak with Ross in the Los Angeles jail, he was illiterate and not represented by counsel. And he apparently was given only the option to waive extradition to Canada; extradition to Clallam County was not discussed. Under these circumstances, Ross's failure to request a trial in Clallam County before being transferred to Canada does not weigh against him.

22

    b. Ross's Conduct During Incarceration in Canada

   Nothing in the record shows that during his incarceration in Canada, Ross ever made a formal request that he be returned to Clallam County to face the first degree murder charge. And there is no question that Ross was aware of the murder charge pending against him because he made several inquiries about the charge during his incarceration.

   The State argues that the record demonstrates that Ross did not want a speedy trial. The State emphasizes that Ross had two opportunities to return to the United States and face trial in Clallam County and declined. Before deciding to remain in Canada in 1988, Ross acknowledged that he likely would have to address his pending charges if he returned.[6] The State argues that Ross was content to stay in Canada without addressing the murder charges and claims that Ross's lack of desire to face a trial in Clallam County should be fatal to his speedy trial claim.[7]

   Ross argues that he never had an opportunity while incarcerated to formally assert his speedy trial claim. He emphasizes that although he had attorneys that assisted him on some matters, he never consulted with an attorney who was appointed to represent him on the Clallam County charge.[8] Further, Ross never appeared in court until 2016 and therefore could not have asserted his claim in court until then.

---

[6] One reason that Ross may have been content to stay in Canada and not push for a trial in Clallam County is that in 2003 the prosecuting attorney refused to agree not to seek the death penalty.

[7] Ross argues that the case law does not support a finding that his failure to demand a speedy trial *waived* his speedy trial claim. However, the State does not argue that Ross waived his claim. The State argues only that the assertion of right factor should weigh heavily against Ross.

[8] Public defender Shea was appointed on an interim basis to represent Ross regarding discovery, but he apparently never talked to Ross and the State refused to provide discovery to him.

The fact that Ross was unrepresented on the murder charge and never appeared in court during the 38-year delay distinguishes this case from *Barker*, *Ollivier*, and *Iniguez*. In those cases, the delays occurred while the defendants were represented and had the opportunity to make multiple court appearances. Ross's inability to consult with counsel about his speedy trial right and the lack of an opportunity to raise the issue in court does mitigate to some extent his failure to assert the right.

However, we cannot ignore the fact that during the time he was incarcerated in Canada, Ross made no effort to facilitate a trial on the murder charge. He never demanded that the State bring him to trial or that the State figure out a way to remove him to the United States. He did not waive extradition or request that Canada transfer him to Clallam County for trial. And when given opportunities to return to the United States and face the murder charge, Ross declined and decided to remain in Canada. This conduct is inconsistent with an assertion of the right to a speedy trial.

Based on Ross's failure to assert his speedy trial right while incarcerated in Canada, we conclude that the assertion of the right factor weighs against Ross even though his failure is mitigated to some extent.

   c. Litigation After 2016

The State notes that even after Ross returned to Clallam County, he waited to assert his speedy trial claim for almost two years. The State claims that this is further evidence that Ross did not want a speedy trial.

Ross responds that he was unable to assert his speedy trial right for over 21 months because when he finally secured an attorney on the Clallam County charges, his attorney needed

time to become familiar with the 38-year history of the case and investigate the cause of the extraordinary delay.

Ross could have asserted his speedy trial right sooner than August 2018. But his attorney certainly needed some time to familiarize himself with the speedy trial evidence and issues while at the same time investigating and defending against the murder charges. Under the circumstances, Ross's delay in asserting his speedy trial claim after 2016 only slightly weighs against him.

5.    Prejudice from Delay

The fourth *Barker* factor is whether the delay has prejudiced the defendant. *Ollivier*, 178 Wn.2d at 827, 840. The State argues that this factor should weigh against Ross because the record shows that the delay did not prejudice him. We disagree.

Prejudice to the defendant as a result of delay may consist of (1) oppressive pretrial incarceration, (2) the defendant's anxiety and concern, and (3) the possibility that dimming memories and loss of exculpatory evidence will impair the defense. *Ollivier*, 178 Wn.2d at 840.[9] Of the three interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. As the Court explained in *Barker*, "[i]f witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." *Id.*

In general, a defendant must show actual prejudice to establish a speedy trial right violation. *Ollivier*, 178 Wn.2d at 840. However, prejudice will be presumed when the delay

_____

[9] Ross does not claim that he was prejudiced in either of the first two ways.

results from the State's negligence and there has been "extraordinary delay." *Id.* at 842. In

*Doggett*, the Court stated, "[W]e generally have to recognize that excessive delay presumptively

compromises the reliability of a trial in ways that neither party can prove or, for that matter,

identify." 505 U.S. at 655. Further, the importance of presumed prejudice increases with the

length of delay. *Id.* at 656. "[W]e presume such prejudice to the defendant intensifies over

time." *Iniguez*, 167 Wn.2d at 295.

Courts generally have presumed prejudice in cases where the delay has lasted at least five

years. *See Ollivier*, 178 Wn.2d at 842-43. For instance, in *Doggett* the Court presumed

prejudice when the State's inexcusable oversights caused a delay of six additional years. 505

U.S. at 657-58. This presumption can be rebutted by a showing that the defendant acquiesced in

the delay or if the State can "affirmatively prove[ ] that the delay left [the defendant's] ability to

defend himself unimpaired." *Id.* at 658 n.4.

Here, the State argues Ross must show actual prejudice because the delay in prosecuting

Ross was not caused by the State's negligence. But as discussed above, we have determined that

the delay was caused in part by the State's negligence. And the 38-year delay in prosecuting

Ross certainly was extraordinary. Therefore, we presume prejudice and find that this factor

weighs against the State unless the State can rebut the presumption or show that Ross acquiesced

in the delay.

The trial court's findings of fact regarding the speedy trial claim list "a few of the

circumstances which prejudiced Mr. Ross's ability to mount a defense":

1. The fingerprint card B-6 was lost or destroyed.
2. Every piece of evidence in the Victoria trial has been lost or destroyed.
3. Tommy Ross was never given access to legal counsel on the Clallam County case through his incarceration in Canada.
4. The memories of eye witnesses have either faded or are compromised.
5. Fingerprint examiners are either dead or unable to testify.

6. Investigating officers have died on both sides of the border.
7. A fingerprint examiner whose opinion was that a single fingerprint found was a forgery is unable to testify.
8. The doorknob where the Defendant's fingerprint is said to have been found was never secured.

CP at 29. Ross states that as reflected in these findings, the evidence shows that the delay caused actual prejudice and prevents the State from rebutting presumptive prejudice.

The State contends that the trial court's assessment of the specific ways that Ross was prejudiced can be rebutted by the record. The State claims that original negatives of lost fingerprint cards, transcripts from testimony in Ross's Victoria murder trial, photographs of the Victoria murder scene, and new fingerprint examiners can remedy any prejudice resulting to Ross from the lapse of time between the 1978 murder and the present.

However, even if these arguments have some merit, the State cannot make an affirmative showing that the delay left Ross's ability to defend himself "unimpaired." *Doggett*, 505 U.S. at 658 n.4. After the extraordinary delay of 38 years, the presumption of prejudice is very strong. We conclude that the State has failed to rebut this presumption.

The Court in *Doggett* suggested that presumed prejudice to the defendant can be "extenuated" by the defendant's acquiescence in the delay. 505 U.S. at 658. Here, as discussed above, Ross arguably did acquiesce to the delay to some extent, but there were some mitigating circumstances. Although this acquiescence is relevant, it cannot overcome the prejudice inherent in such an extraordinary delay.

We conclude that the 38-year delay presumptively prejudiced Ross, that the State has failed to rebut the presumption of prejudice, and that the prejudice factor weighs against the State.

6.    Balancing the Factors

We must balance the four *Barker* factors. *Ollivier*, 178 Wn.2d at 827, 846. As discussed above, the length of delay, reason for delay, and prejudice from the delay weigh against the State. The assertion of the right factor weighs against Ross.

The State discounts the importance of the length of delay and presumed prejudice and argues that Ross's failure to assert his speedy trial right during his incarceration in Canada should be given the most weight.

However, the primary reason for the delay – usually the most significant factor – was the State's negligence in allowing Ross to be transferred to Canada without an enforceable agreement to return him and its subsequent failure to make any effort after the first year to secure Ross's transfer back to Clallam County. In addition, the 38-year length of the delay is significant, as is the very strong presumption of prejudice resulting from that lengthy delay. These three factors outweigh Ross's failure to assert his speedy trial right, which is somewhat mitigated by the fact that he was unrepresented and had no opportunity to assert his right in court.

Considering all the *Barker* factors, we are constrained to conclude that the balancing test weighs against the State. Accordingly, we hold that the State violated Ross's speedy trial right under the United States and Washington Constitutions.

Dismissal of the charges against the accused is " 'the only possible remedy' " for a violation of the constitutional right to a speedy trial. *Strunk v. United States*, 412 U.S. 434, 440, 93 S. Ct. 2260, 37 L. Ed. 2d 56 (1973) (quoting *Barker*, 407 U.S. at 522). Therefore, we hold that the trial court did not err in dismissing the murder charges against Ross.

CONCLUSION

We affirm the trial court's dismissal of the murder charges against Ross based on a violation of his speedy trial right.

_____
MAXA, C.J.

We concur:

_____
WORSWICK, J.

_____
GLASGOW, J.