# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58963-0-II |
| Respondent, | |
| v. | |
| DONALD HENRY MOULTON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—OJ, a four-year-old girl, approached her mother and said that Donald Moulton, her step-great-grandfather, had put his finger in her vagina while they were alone together on Moulton's boat. OJ then said the same thing during a forensic interview several days later.

In January 2022, the State charged Moulton with first degree child rape. Based primarily on requests from Moulton's defense counsel, the trial court delayed Moulton's trial until October 2023. Before trial, the trial court held a child hearsay hearing and found OJ unavailable to testify. However, the trial court found OJ's prior statements to her mother and to the forensic interviewer sufficiently reliable to admit under RCW 9A.44.120, which allows admission of child hearsay under specific circumstances.

At trial, OJ's mother testified about OJ's out-of-court statements, and the State played a video recording of OJ's forensic interview for the jury. The jury convicted Moulton of first degree child rape, and the trial court sentenced him to an indeterminate sentence of 108 months to life.

On appeal, Moulton argues that the trial court violated his constitutional right to confront witnesses by admitting OJ's out-of-court statements. He also argues that the trial court abused its

discretion by finding OJ's statements sufficiently reliable for admission under RCW 9A.44.120. Finally, Moulton argues that the trial court's delay of his trial violated his constitutional right to a speedy trial and the mandatory trial deadlines set out in CrR 3.3.

We conclude that because of her young age, OJ's statements to her mother and the forensic interviewer were not testimonial, so they do not implicate Moulton's right to confront witnesses. And the trial court's findings that OJ's statements were sufficiently reliable are supported by substantial evidence. Finally, because Moulton's defense counsel requested a majority of the continuances that delayed trial, the trial court did not violate Moulton's constitutional right to a speedy trial or CrR 3.3. Accordingly, we affirm.

FACTS

I. BACKGROUND

In November 2021, OJ, a four-year-old girl, approached her mother and said she had a secret. OJ's mother told OJ, "[W]e don't have secrets in our family" and asked OJ what happened. 1 Verbatim Rep. of Proc. (VRP) at 104. OJ said that she loved her "Grandpa Don," which is what she called Moulton, but he "stuck his finger in her vagina" and it hurt. *Id.*

Starting in the summer of 2021, Moulton spent time at OJ's mother's property working on a boat that he was storing there. Moulton was OJ's stepfather's grandfather. OJ would sometimes spend time with Moulton on the boat.

OJ's mother recalled that in September 2021, she went out to the boat to check on OJ and Moulton and saw OJ underneath blankets without any clothes on. OJ's mother said that when she asked why OJ was naked, Moulton replied that she had had an accident. When OJ's mother entered

the boat, Moulton was fully clothed, and she did not hear any "sudden rustling or rushing around." 3 VRP at 765.

One or two days after OJ disclosed the alleged sexual assault, OJ's mother called 911 and spoke with law enforcement. When she made this call, Moulton had not been to her property in at least two weeks. Several days later, OJ participated in a forensic interview. The same day as the interview, a nurse practitioner evaluated OJ and determined that OJ had a normal genital exam. Police searched Moulton's boat on OJ's mother's property and found no evidence of the alleged sexual assault.

## II. PRETRIAL

Police arrested Moulton and he was released from custody on January 6, 2022. The State charged Moulton with one count of first degree child rape of OJ.

A.      OJ's Testimony at Child Hearsay Hearing

The trial court held a child hearsay hearing. Moulton's counsel moved to exclude OJ's testimony because OJ's mother had not allowed him to interview OJ before the hearing, so he would be "flying blind" when examining OJ during the hearing. 1 VRP at 77. Moulton's counsel also alerted the trial court that he anticipated challenging OJ's competency to serve as a witness. The trial court moved forward, allowing OJ to testify at the hearing.

OJ testified first at the child hearsay hearing. The trial court established that OJ knew she should tell the truth and demonstrated that she knew the difference between the truth and a lie. OJ knew her age but did not remember her birthday. The State then also demonstrated that OJ knew the difference between the truth and a lie. OJ testified that she had gotten in trouble "[a] lot" for telling lies and then admitting that they were lies. 1 VRP at 83.

OJ testified that she did not go by any other names besides her first name. She then confirmed that she also went by a nickname. When asked on cross-examination whether she lied when she stated earlier that she did not go by any other names, OJ said, "I did lie the first time" and explained that it was because she was "a little nervous." 1 VRP at 90. OJ then confirmed that she knew she should not lie while on the stand.

OJ initially said she did not have a "Grandpa Don" and did not spend time with Grandpa Don. 1 VRP at 83. She could not identify Moulton in the courtroom. When asked again if Moulton was Grandpa Don, OJ replied, "I think." *Id.* Immediately after this, when asked if she spent time with Grandpa Don, OJ replied, "Yeah." 1 VRP at 84. OJ confirmed that Grandpa Don had a boat at her house, and she was on that boat with him when she was three years old. When asked if Grandpa Don ever touched her on the boat, OJ said that he did "a few times" when she was hugging him. *Id.* OJ said she had not "played doctors" with Grandpa Don or told anyone that she had played doctors with him. *Id.* OJ also stated that she missed Grandpa Don and had not seen him in a long time.

When asked if she ever told her mother a secret about Grandpa Don, OJ replied, "I don't keep secrets." *Id.* She then said she had not told her mother about something that Grandpa Don did. OJ also said she had not told her mother that Grandpa Don touched her. OJ stated that she had never told her mother or anyone else a lie about Grandpa Don, and that if she had, she would have told the truth if asked about it later.

When asked if she knew what "private parts" are, OJ answered, "My butt one." 1 VRP at 86. When prompted to list other private parts, she said, "I have my nose and my mouth and my ears are, my head is." *Id.* OJ said that nobody had touched her vagina except for herself.

4

During cross-examination, OJ said that she had not told the State she did not have a Grandpa Don. OJ then again stated, "I don't have a Grandpa Don," and that she did not know who Grandpa Don was. 1 VRP at 89.

After this exchange, OJ expressed that she was scared and refused to stand up from the floor. The trial court allowed OJ's child advocate to stand near her over defense counsel's objection. OJ's behavior then started to deteriorate. She would not stand up or answer questions, so the trial court took a short break. During questioning after the break, OJ struggled to focus and said that she had "two faces." 1 VRP at 93. She again stated that she had lied about her nickname but she "didn't mean to" and it was the only thing she had lied about that day. 1 VRP at 92. When asked by defense counsel, she confirmed that lying was something she "can't control." 1 VRP at 93.

Defense counsel moved to find OJ incompetent as a witness. After hearing from both parties, the trial court determined that OJ was incompetent and therefore unavailable as a witness for trial. The trial court stated that OJ consistently understood her "obligation to speak the truth on the witness stand" and could comprehend "[d]irect, simple questions." 1 VRP at 98-99. But she did not have sufficient independent memory or ability to express her memory of the alleged occurrence. Given OJ's testimony and "her brief meltdown," the trial court concluded that she was unavailable as a witness. 1 VRP at 99.

B.      OJ's Mother's Testimony at Child Hearsay Hearing

The trial court then continued with the child hearsay hearing. OJ's mother testified that Moulton would come to their house to work on his boat, which he stored on their property. OJ's

5

mother testified that OJ and Moulton were alone together several times on the boat. She also stated that Moulton had not been to their property for about a year.

OJ's mother said that in November 2021, OJ approached her:

> At first she didn't want to tell me because she said that it was a secret, and that was a red flag for me, because we don't have secrets in our family. And so I told her, you know, you can tell me anything, we don't have secrets, and then she stated that she loves Grandpa Don, but he stuck his finger in her vagina.

1 VRP at 104. Immediately after this disclosure, she brought OJ to see OJ's grandmother. When asked to tell her grandmother what she had said to her mother, OJ again said that Moulton put his finger in her vagina.

OJ's mother recalled a prior instance where she walked onto the boat on her property and saw OJ naked under a blanket. When she asked Moulton why OJ was naked, he said that OJ had an accident and "just wanted to sleep like that." 1 VRP at 107. Moulton was fully clothed when she walked in and was not "moving about and fumbling around, trying to cover things up." 1 VRP at 118. OJ's mother also remembered a conversation where Moulton said OJ "was asking questions about her vagina and he said that he was educating her," which OJ's mother described as a "red flag." 1 VRP at 108.

OJ's mother said that OJ would tell "simple" lies about things like whether she cleaned her room and would sometimes lie to her cousin. 1 VRP at 109. Other than that, "[OJ] doesn't lie." 1 VRP at 110. In addition, when confronted with a lie about cleaning her room, for example, OJ would apologize and fix it.

C.     Forensic Interviewer's Testimony at Child Hearsay Hearing

During the hearing, the forensic interviewer first explained that a forensic interview "is a[n] interview that's based on research and is done in preparation for a court hearing if one comes up." 1 VRP at 131. The trial court then watched a recording of OJ's forensic interview.

During the forensic interview, OJ was excited and enthusiastic; she stood on her chair and jumped around. Even while disclosing the alleged sexual assault, she exhibited active and childlike behaviors, spinning in circles and wandering in a comfortable and playful manner.

The forensic interviewer asked OJ what she had eaten that day and OJ indicated that she had not eaten anything, though she was eating chips at the time. However, when the interviewer asked, "What about chips?" OJ said, "I was eating chips." Ex. 40, at 3.

During the interview, OJ identified her chest, bottom, and vagina as "private parts." *Id.* at 12. OJ told the forensic interviewer that Moulton put his finger in her vagina and it hurt, and she demonstrated that act while lying on her back. OJ also said that she "jump[ed] to get his finger out" and demonstrated that motion. *Id.* at 13. This occurred on the boat at her house. OJ said that while on the boat with Moulton, they played games, including "doctors" where she "checked" him. *Id.* at 16. She said that Moulton would do "kisses and cuddles." *Id.* at 18. OJ demonstrated peck-like kisses and wrapped her arms around her own torso and squeezed to show how Moulton touched her. OJ told the forensic interviewer that somebody burned her and Moulton's clothes and they went outside naked.

After hearing arguments from both parties, the trial court found that OJ's statements to her mother and the child forensic interviewer were sufficiently reliable to be admitted as child hearsay. The trial court also found OJ's statements were sufficiently corroborated so that OJ's mother and

the forensic interviewer could testify about them during trial even though OJ was unavailable to

testify because the trial court had ruled she lacked competence. More details about the trial court's

ruling appear in the relevant analysis sections below.

## III. TRIAL

Due to a variety of circumstances and requests from both parties, the trial court continued

Moulton's trial many times. Moulton objected to eight of these requests for continuances.

Moulton's trial began on May 10, 2023. However, due to a failure of the trial court's recording

technology, the first three days of jury selection were not recorded, which led to a mistrial. Again,

based on multiple requests from both parties, the trial court further continued Moulton's trial until

October 11, 2023, about 21 months after Moulton was first charged. We include a more detailed

description of the delays in the relevant analysis section below.

A.      May 2023 Trial

At the trial on May 10, 2023, defense counsel moved to exclude the video of OJ's forensic

interview and the forensic interviewer's testimony. Defense counsel argued that admission of the

interview and testimony would violate Moulton's right to confront witnesses. Defense counsel

argued that OJ's statements to the forensic interviewer were testimonial and therefore could only

be admitted if defense counsel had the opportunity to cross-examine OJ.

The State responded that OJ's statements were not testimonial because children her age do

not understand the purpose of their statements in the context of the criminal justice system. The

State contended that OJ's behavior during the forensic interview demonstrated that OJ was a "very

energetic four-year-old girl who was playing around, sliding down chairs, eating chips. That might

have been the most telling of how this was not a formal interview from her mindset. This is, she's

just having a talk. She's having a talk with somebody who's asking her questions about her wellbeing." 1 VRP at 212.

The trial court concluded that OJ's statements were not testimonial because "statements made by a child at three are almost never going to be testimonial. And there is absolutely nothing in this case that points to those statements being testimonial." 1 VRP at 221.[1] The trial court denied defense counsel's motion to exclude the forensic interview and the forensic interviewer's testimony.

B.      October 2023 Trial

Before opening arguments at the October 11 trial, defense counsel renewed his motion to exclude the video of OJ's forensic interview. The trial court again denied the motion.

At trial, OJ's mother testified consistently with her statements during the child hearsay hearing. OJ's mother additionally testified that at some point during the period where OJ spent time with Moulton, OJ's behavior changed. OJ started to "get angry," which OJ's mother stated was "very unlike her," and began to have more accidents despite being potty trained. 3 VRP at 760. On cross-examination, OJ's mother stated that OJ would sometimes take her clothes off when she got too hot but would keep her underwear or her pants on.

The State played the video of OJ's forensic interview for the jury and called the forensic interviewer as a witness. The State also called the nurse practitioner who physically examined OJ and the detectives who investigated the alleged incident as witnesses. The nurse testified that a normal genital exam does not necessarily indicate that sexual abuse did not occur. And one of the detectives testified that she did not look for burn piles while searching Moulton's boat.

---

[1] The trial court apparently misspoke. OJ was four years old at the time of the forensic interview.

The jury found Moulton guilty of one count of first degree child rape of OJ. The trial court sentenced Moulton to an indeterminate standard-range sentence of 108 months to life with lifetime community custody.

ANALYSIS

I. ADMISSION OF OJ'S OUT-OF-COURT STATEMENTS

A.     Confrontation Clause

Moulton argues that the trial court's admission of OJ's out-of-court statements to her mother and the child forensic interviewer, including the video of the forensic interview with OJ, violated Moulton's right to confront witnesses.

A criminal defendant has the right to confront the witnesses against them. U.S. CONST. amend. VI.; WASH. CONST. art. I, § 22. The confrontation clause prohibits admission of testimonial hearsay statements from a witness who did not appear at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *State v. Hall-Haught*, 4 Wn.3d 810, 815, 569 P.3d 315 (2025). Accordingly, nontestimonial statements are outside of the scope of the confrontation clause. *State v. Wilcoxon*, 185 Wn.2d 324, 332, 373 P.3d 224 (2016). We review confrontation clause claims de novo. *State v. Galeana Ramirez*, 7 Wn. App. 2d 277, 283, 432 P.3d 454 (2019).

To determine whether a witness's statements are testimonial, we apply the primary purpose test. *State v. Scanlan*, 193 Wn.2d 753, 765-66, 445 P.3d 960 (2019). Generally, statements are testimonial when circumstances indicate that the primary purpose of questioning a witness was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

10

However, in *Ohio v. Clark*, the United States Supreme Court explained that statements "by very young children will rarely, if ever, implicate the Confrontation Clause." 576 U.S. 237, 247-48, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015). This is because research demonstrates that young children do not understand the details of the criminal justice system. *Id.* at 248. The Court thus concluded that a 3-year-old's statements to his teachers were not testimonial in part because it was "extremely unlikely" that he intended his statements to be a substitute for trial testimony. *Id.* A young child disclosing abuse in these circumstances "would simply want the abuse to end, would want to protect other victims, or would have no discernable purpose at all." *Id.* The *Clark* Court also recognized that "'the informality of the situation and the interrogation'" is a factor to consider when determining if statements are testimonial. *Id.* at 245 (quoting *Michigan v. Bryant*, 562 U.S. 344, 377, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)). For example, a formal police station interrogation "is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Id.*

Surveying federal and state cases applying the confrontation clause, including *Clark*, Division One also concluded that in some circumstances, statements are not testimonial where the declarant is unaware that their statements will possibly be used later in a criminal prosecution, even when the interviewer is asking the declarant questions for that purpose. *See State v. Ta'afulisia*, 21 Wn. App. 2d 914, 930-38, 508 P.3d 1059 (2022).

Moulton contends that OJ's statements to her mother and to the forensic interviewer were made for the purpose of investigating and prosecuting Moulton, and they were therefore testimonial. We disagree.

11

OJ's statements to her mother were spontaneous; OJ's mother was not aware that OJ would discuss Moulton or an alleged sexual assault until after the statements were made. Thus, OJ's statements were not made for the purpose of establishing facts for a criminal prosecution and were not testimonial.[2]

Although the forensic interviewer's primary purpose was to gather evidence potentially to be used at trial, OJ was only four years old when she spoke to the interviewer. The forensic interviewer did not inform OJ that her statements would potentially be used to prosecute Moulton and asked mostly open-ended questions about OJ's experiences instead of direct, interrogative questions. Even though the forensic interviewer's purpose was to determine whether a crime occurred that should be prosecuted, the *interviewer's* purpose alone is not determinative under our case law. *See Ta'afulisia*, 21 Wn. App. 2d at 930-38. Here, OJ was so young that her answers were likely not given with investigation or prosecution in mind. During the interview, OJ seemed relaxed and excited and was jumping around and eating chips. This reflects a more informal environment than a traditional police interview and demonstrates that OJ did not understand that her statements during the interview could be used for the very serious purpose of prosecuting Moulton. OJ's actions align with the reasoning in *Clark* that statements from young children "will rarely, if ever, implicate the Confrontation Clause" because very young children often cannot comprehend the implications of the criminal justice system. 576 U.S. at 248. Accordingly, OJ's statements during the forensic interview were not testimonial.

---

[2] Although we resolve this issue, we note that Moulton only nominally raises this issue in his opening brief but does not analyze or discuss this issue at all.

Because we hold that OJ's statements to her mother and the forensic interviewer were not testimonial, they do not implicate the confrontation clause. *Wilcoxon*, 185 Wn.2d at 332. Thus, we need not address whether Moulton had an opportunity to cross-examine OJ in the context of this claim.

B.      Child Hearsay

Moulton argues that the trial court erred by admitting OJ's hearsay statements to her mother and the forensic interviewer as child hearsay.

1.      Legal principles

Under RCW 9A.44.120(1)(a)(i), a trial court may admit an otherwise inadmissible hearsay statement from a child under the age of ten "describing any act of sexual contact performed with or on the child by another." To admit these child hearsay statements, the court must conduct a hearing outside the presence of the jury and find that the "time, content, and circumstances of the statement provide sufficient indicia of reliability." RCW 9A.44.120(1)(b). Additionally, either the child must testify at trial, or the trial court must find that the child is unavailable as a witness and there is corroborative evidence of the alleged sexual assault. RCW 9A.44.120(1)(c)(i)-(ii).

Often in cases of sexual child abuse, prosecutors "must rely on the testimony of the child victim to make their cases because in general, acts of abuse occur in private and often leave no physical evidence." *State v. Houser*, 30 Wn. App. 2d 235, 264, 544 P.3d 564, *review denied*, 3 Wn.3d 1015 (2024). The child hearsay statute is meant to ameliorate "the difficult problems of proof that often frustrate prosecutions for child sexual abuse." *State v. Jones*, 112 Wn.2d 488, 493-94, 772 P.2d 496 (1989).

No. 58963-0-II

Courts consider nine factors to determine whether to admit child hearsay statements under RCW 9A.44.120, as outlined by the Washington Supreme Court in *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984). *Houser*, 30 Wn. App. 2d at 266. The *Ryan* factors are

> (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statement, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*State v. Kennealy*, 151 Wn. App. 861, 880, 214 P.3d 200 (2009) (footnote omitted). "No single *Ryan* factor is dispositive," and courts must determine that these factors are "'substantially met'" from an overall evaluation of the circumstances. *Houser*, 30 Wn. App. 2d at 266; *Kennealy*, 151 Wn. App. at 881 (quoting *State v. Griffith*, 45 Wn. App 728, 738-39, 727 P.2d 247 (1986).

"We review a trial court's decision to admit child hearsay statements for an abuse of discretion." *Kennealy*, 151 Wn. App. at 879. A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.* "We review challenges to findings of fact to determine whether substantial evidence supports each challenged finding." *State v. A.X.K.*, 12 Wn. App. 2d 287, 298, 457 P.3d 1222 (2020). "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the premise's assertion." *Id.* Appellate courts may use the trial court's oral rulings to interpret written findings and conclusions if no inconsistency exists. *State v. Ward*, 125 Wn. App. 138, 145, 104 P.3d 61 (2005).

2.       Application of the *Ryan* factors

Moulton contends that the trial court abused its discretion by concluding that the *Ryan* factors of reliability were substantially met. Specifically, Moulton challenges the trial court's

14

findings that factor 1 (apparent motive to lie), factor 2 (general character of declarant), factor 5 (timing of declaration and relationship between declarant and witness), and factor 8 (possibility the declarant's recollection is faulty) weighed in favor of finding OJ's statements admissible. *See* CP at 44-45.

> a. Factor 1: apparent motive to lie

The trial court found that there was nothing in the testimony at the child hearsay hearing that indicated OJ had a motive to lie about her allegations. In fact, OJ testified that she loved and missed Moulton and her mother's testimony showed she liked to spend time with him. The trial court found that, on balance, this factor weighed in favor of reliability.

Moulton argues that the trial court ignored OJ's demeanor at the child hearsay hearing, which showed "a complete disregard for the truth." Br. of Appellant at 35. Specifically, Moulton contends that OJ showed a propensity to lie and told the forensic interviewer "outlandish things" like Moulton had burned their clothes while outside the boat naked and that she had not eaten anything the day of the interview while she was eating chips. *Id.*

Though OJ sometimes struggled to provide consistent or relevant statements during the child hearsay hearing, nothing from her testimony indicated that she had a *motive* to lie that Moulton sexually assaulted her. As the trial court indicated, OJ said that she loved and missed Moulton, and she did not seem to understand the implications of the hearing. During both the hearing and the forensic interview, OJ exhibited many characteristics of an active and easily distractable young child, but not one with a reason to lie about this allegation. Substantial evidence supports the trial court's finding that OJ had no apparent motive to lie.

b.      Factor 2: general character of declarant

The trial court found that OJ's mother was "open about defiance and truthfulness issues at home," and testified that OJ "generally interacted well with others and made friends easily, although tended to be nervous around people she didn't know." Clerk's Papers (CP) at 43. The trial also court found that though OJ "sometimes tells fibs," the testimony at the child hearsay hearing indicated that when confronted with those lies, "she rapidly backtracks and tries to make things correct." 1 VRP at 165. The trial court stated that this was a "normal childlike response to when you're caught with being [in] a fib," and concluded that OJ was "just an eccentric, happy five-year-old with way too much energy." *Id.* The trial court ultimately concluded that there was "no testimony of any propensity to telling falsehoods or creating any more disturbance" than any other young child and that this factor weighed in favor of OJ's reliability. CP at 43.

Moulton argues that the trial court "disregarded evidence that [OJ] was evasive, admitted lying at times, [and] openly lied about absurd things," which indicated that she did not have a reputation for telling the truth. Br. of Appellant at 36.

"When assessing a child's general character, we look to whether the child has a reputation for truthfulness." *Kennealy*, 151 Wn. App. at 881. Though there was testimony from OJ and her mother that OJ sometimes told small lies, as the trial court found, the record also reflects that OJ admitted when she lied and corrected the statements. OJ testified that she knew the difference between the truth and a lie and the trial court found her sufficiently trustworthy given the normal developmental limitations of her age. Moulton has not shown a lack of substantial evidence to support the trial court's finding.

c.      Factor 3: whether more than one person heard the statements

The trial court found that both OJ's mother and the child forensic interviewer heard OJ's consistent disclosures. The trial court determined that this factor weighed in favor of OJ's reliability. Moulton does not challenge this finding.

d.      Factor 4: spontaneity of the statements

The trial court determined that OJ's initial statements to her mother were spontaneous because OJ brought up the alleged incident without any prompting. The trial court also stated that OJ's statements to the forensic interviewer were spontaneous because the forensic interviewer's "processes and training" were "designed to be child-driven and not lead the child to a preferred or pre-determined place or disclosure." CP at 44. The trial court found that this factor weighed in favor of OJ's reliability. Moulton does not challenge this finding.

e.      Factor 5: timeline of declaration and relationship between declarant and witness

The trial court acknowledged that OJ's disclosure was at most a few months after the alleged incident. However, the trial court noted that consistent disclosures to OJ's mother and the forensic interviewer occurred within one week. And the trial court concluded that nothing indicated OJ did not have a positive relationship with her mother, and OJ had no relationship with the forensic interviewer at the time of the interview. Accordingly, the trial court concluded that this factor weighed in favor of OJ's reliability.

Moulton argues that before OJ's initial disclosure, OJ's mother said that their family had no "'secrets,'" and this created an expectation that OJ would have to tell her "*something* in order to avoid being seen as keeping secrets, contrary to the family credo." Br. of Appellant at 37.

Moulton contends that this demonstrates that the relationship and circumstances of the declaration were not neutral.

When a witness "is in a position of trust with a child, this factor is likely to enhance the reliability of the child's statement." *Kennealy*, 151 Wn. App. at 884. Here, as the trial court found, there is nothing on this record that indicates OJ had anything but a positive relationship with her mother. And OJ approached her mother spontaneously, stating that she had a secret; the fact that OJ's mother said their family did not keep secrets under these circumstances does not indicate that OJ's mother was putting pressure on OJ to reveal something about Moulton specifically. This factor weighs in favor of reliability.

        f.      Factor 6: whether the statements contained express assertions of past fact

The trial court acknowledged that courts no longer look to this factor when assessing reliability and accordingly did not address it. Moulton does not challenge this finding.

        g.      Factor 7: whether declarant's lack of knowledge could be established through cross-examination

The trial court noted that the State conceded this factor weighed against reliability, and Moulton does not challenge the trial court's finding regarding this factor.

        h.      Factor 8: possibility declarant's recollection is faulty

The trial court said it was balancing OJ "being a four-year-old and being prone to small fibs" with "her appropriate four-year-old's reaction to when she's confronted with those types of things" and "the consistency of [her] statements when she does make the statements." 1 VRP at 169. The trial court also wrote that

> [OJ's] disclosures are consistent and nothing in this hearing indicated any defect in memory at the time of the disclosures. Each of the disclosures discuss Grandpa Don putting his finger in her vagina. This includes both the statement to her mother and

to [the forensic interviewer] in the forensic interview. It is highly unlikely her memory was faulty at the time of the initial disclosures.

CP at 44-45. Ultimately, the trial court concluded that this factor weighed in favor of reliability.

Moulton argues that OJ "was given to making outlandish, clearly false claims" and lied to the forensic interviewer though she claimed she knew she had to tell the truth during the interview. Br. of Appellant at 38. As a result, Moulton contends that "it cannot be realistically assumed that the allegation of sexual abuse falls firmly into the realm of reality." *Id.*

"[W]hen a child makes a statement soon after an event and then makes consistent statements to other people shortly thereafter, there is little possibility that the child's recollection was faulty." *Kennealy*, 151 Wn. App. at 884. Additionally, young children are "'unlikely to fabricate a graphic account of sexual activity because such activity is beyond the realm'" of their experience. *Id.* (internal quotation marks omitted) (quoting *State v. Frey*, 43 Wn. App. 605, 610, 718 P.2d 846 (1986)).

Here, though the record does not establish exactly when the alleged sexual assault occurred, OJ made consistent statements that Moulton put his finger in her vagina to her mother and the forensic interviewer within a few days. Additionally, while OJ's broader testimony was not always consistent and sometimes included fantastical elements, her testimony about the assault itself was consistent. OJ's testimony constitutes a description of the kind of graphic sexual activity that courts have found young children are unlikely to make up because it is typically beyond their experience. Thus, the trial court did not abuse its discretion in finding this factor weighs in favor of reliability.

19

i.      Factor 9: surrounding circumstances

When considering this factor, the trial court said that it had "significant concerns" about

the "potentially vibrant fantasy aspect" to some of OJ's statements, like when she said her and

Moulton's clothes were burned. 1 VRP at 169. The trial court then stated,

> [W]e're balancing that against the statements which are consistent, and in watching
> the video, that the physical actions demonstrated by [OJ] . . . are consistent with her
> statements. You know, the description of the hug. And I think, [defense counsel],
> you used the phrase bearhug, and that was exactly how [OJ] demonstrated that. But
> when she also talked about the touching of her vagina, she flopped down on her
> back, spread her legs, grabbed her vagina or very near to it. All in all, I think [factor]
> nine is a wash.

*Id.* Moulton does not challenge the trial court's assessment of this factor.

3.      Conclusion

We hold that the trial court did not abuse its discretion when it found facts related to the

*Ryan* factors, found the *Ryan* factors were substantially met, and determined that OJ's statements

to her mother and the forensic interviewer were sufficiently reliable under a balancing of the *Ryan*

factors. As established above, each of the trial court's challenged findings was supported by

substantial evidence.

In his assignments of error, Moulton also challenges the trial court's finding that

corroborative evidence of the alleged assault supported OJ's hearsay statements. The trial court

found that OJ's statements were corroborated by several pieces of evidence: Moulton's boat was

on OJ's mother's property and Moulton was routinely there; OJ's mother saw OJ naked on the

boat with Moulton on one occasion; OJ's mother testified that Moulton said OJ asked him about

her vagina; and during the forensic interview, OJ demonstrated jumping to get Moulton's finger

out of her vagina. The argument made in Moulton's brief does not specifically refute the trial

court's reasoning. Thus, there has not been a showing of an abuse of discretion as to this aspect of the child hearsay analysis.

In sum, we conclude that the trial court did not err when it admitted OJ's out-of-court statements, including the video of the forensic interview.

## II. DELAY OF TRIAL

Moulton argues that the trial court committed reversible error by delaying his trial for almost 21 months. He argues that this violated his constitutional right to a speedy trial and the required trial deadlines outlined in CrR 3.3. We disagree.

A.      Trial Timeline

Moulton appeared for his arraignment on January 18, 2022, and trial was set for April 5, 2022. Moulton's final trial did not start until October 11, 2023, almost 21 months after his arraignment.

Throughout Moulton's proceedings, defense counsel asked for 7 out of the 10 trial continuances. This included seven defense requests for continuances that ultimately delayed Moulton's time for trial date under CrR 3.3.[3] Defense counsel requested to delay trial for several reasons, all relating to his ability to properly prepare for Moulton's defense. For example, defense counsel asked for several continuances because he needed more time to investigate or to schedule an interview with OJ, whose mother refused to let him interview her. He also requested continuances because he needed more time between the child hearsay hearing and trial, because

---

[3] Defense counsel also requested, and the trial court granted, many more trial continuances that did not delay the time for trial date under CrR 3.3. Moulton also objected to two of these requests for continuances.

of other trials and preplanned vacations, and because counsel was sick. On several occasions, Moulton signed a waiver of speedy trial for these continuances.

Moulton objected to two of his defense counsel's requests for continuances that delayed the time for trial date. During one of his objections on September 19, 2022, Moulton requested dismissal of his case under CrR 3.3: "It seems overwhelming at this point, that the case should be dismissed because it cannot reach a trial date within the reasonable parameters. I see it as numbers in my head. That's what the numbers say." 1 VRP at 54. The trial court found that defense counsel had established a need for a delay to properly prepare for trial by continuing to attempt to make arrangements to interview OJ to assess her competence and prepare for the child hearsay hearing. Defense counsel was also concerned about too short a time between the child hearsay hearing and the start of trial. For Moulton's second objection, the trial court found that a delay was warranted because of defense counsel's long-planned, out-of-state travel to take his son to college.

In addition, during Moulton's proceedings, the State requested only four trial continuances. On August 29, 2022, the State requested a period to be excluded from the time for trial calculation until September 10 because a key medical witness was unavailable. Moulton's defense counsel agreed to the continuance, stating that he was not ready for trial because he still needed to schedule a deposition with OJ. Moulton objected to the continuance and requested dismissal of his case under CrR 3.3. The trial court granted the State's continuance request due to the witness's unavailability, and Moulton's counsel stated he needed more time. The trial court also denied the request for dismissal.

On March 21, 2023, the State requested two excluded periods totaling three weeks because one witness had just had surgery and another detective witness was unavailable due to training.

Moulton objected to the continuance. However, defense counsel noted that between the excluded periods, he would be away on vacation and did not "see any prejudice to the presentation of Mr. Moulton's case" if the trial court granted the continuance. 1 VRP at 184. The trial court granted the State's continuance due to witness unavailability and, again, defense counsel said there would not be prejudice to Moulton's case.

On September 12, 2023, the State requested a two-week continuance because a detective witness was unavailable due to training. The trial court granted the continuance over Moulton's objection. However, this continuance did not delay Moulton's time for trial date.

On September 26, 2023, the State asked for a week-long continuance because a key witness was out of state. Defense counsel asked to proceed with trial but noted that he would not be willing to stipulate to a missing witness instruction and that he did not "see any prejudice to Mr. Moulton's ability to present a case with the [c]ourt granting a continuance," even "notwithstanding Mr. Moulton's continued objection to violation to his speedy trial rights." 1 VRP at 274. The trial court granted the State's continuance over Moulton's objection because of witness availability and, again, defense counsel acknowledged there would be no prejudice to Moulton's case.

B.     Constitutional Right to Speedy Trial

Moulton argues that the trial court violated his constitutional right to a speedy trial. We disagree.

1.      Legal principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution both guarantee a criminal defendant the right to a speedy trial. *State v. Ross*, 8 Wn. App. 2d 928, 932, 441 P.3d 1254 (2019). Under United States Supreme Court

precedent, prosecutors and the courts bear the "'primary burden'" to ensure that cases are brought to trial efficiently. *Id.* (quoting *Barker v. Wingo*, 407 U.S. 514, 529, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)).

Our analysis for the right to a speedy trial under the Sixth Amendment and article I, section 22 is substantially the same. *Id.* at 941. "We review de novo whether a defendant's constitutional right to a speedy trial has been violated." *Id.*

To trigger a constitutional speedy trial analysis, a defendant must first "make a threshold showing that the time between the filing of charges and trial exceeded the ordinary interval for prosecution and crossed into presumptively prejudicial delay." *Id.* at 942.

Once a defendant makes this threshold showing, we then apply the balancing analysis outlined in *Barker* to determine if the delay violated the defendant's constitutional right to a speedy trial. *State v. Ollivier*, 178 Wn.2d 813, 827, 312 P.3d 1 (2013). The nonexclusive *Barker* factors include the "[l]ength of delay, the reason for the delay, the defendant's assertion of [their] right, and prejudice to the defendant." *Barker*, 407 U.S. at 530. The *Barker* analysis is fact-specific and dependent "on the particular circumstances of the case." *Ross*, 8 Wn. App. 2d at 942. No one *Barker* factor "is sufficient or necessary to find a violation, but they assist in determining whether the speedy trial right was violated." *Id.*

2.    Application of *Barker* factors

The State concedes that the delay in this case was sufficient to trigger the *Barker* analysis.

a.    Length of the delay

The first *Barker* factor "focuses on the extent to which the delay stretches past the bare minimum needed to trigger the *Barker* analysis." *State v. Iniguez*, 167 Wn.2d 273, 283-84, 217

P.3d 768 (2009). The *Ollivier* court cited cases from other jurisdictions where delays ranging from 21 months to over four years were not considered "exceptionally long" if "the delay was attributable to the defense." 178 Wn.2d at 828. The court determined that, under this *Barker* factor, the 23-month trial delay allowing defense counsel to prepare for Ollivier's defense weighed against finding a violation of Ollivier's speedy trial right. *Id.* at 830-31.

Moulton argues that the delay of his trial for almost 21 months, which both parties agree triggers the *Barker* analysis, weighs in favor of a speedy trial violation. We disagree.

Here, while a 21-month delay triggers the *Barker* analysis, it is not exceptionally long under our case law. This is particularly true because Moulton's defense counsel requested a majority of the continuances that led to the delay in this case. Accordingly, the length of the delay weighs against finding the trial court violated Moulton's right to a speedy trial.

    b.   Reason for the delay

The second *Barker* factor, the reason for the delay, is "the focal point of the balancing analysis." *Ross*, 8 Wn. App. 2d at 944. Our analysis of this factor focuses on whether the State or the defendant is "'more to blame'" for the delay. *Id.* (quoting *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). "The State's deliberate delays will be weighed heavily against it, but even negligence that causes delay will be weighed against the State." *Id.* On the other "end of the spectrum is the situation where the defendant requests or agrees to the delay and therefore 'is deemed to have waived his speedy trial rights as long as the waiver is knowing and voluntary.'" *Ollivier*, 178 Wn.2d at 831 (quoting *Iniguez*, 167 Wn.2d at 284). Even where the defendant objects to defense counsel's requests for continuances, the delay is still

attributable to the defendant if defense counsel sought the continuances in order to provide adequate representation. *Id.* at 834-35.

Moulton acknowledges that the reason for the delay was due to both the State's and defense counsel's requests for continuances and that he signed several speedy trial waivers. However, Moulton argues that the trial court violated his constitutional right to a speedy trial under this factor because, on several occasions, he "strenuously objected" to the motions to continue and moved for dismissal of the case based on speedy trial grounds. Br. of Appellant at 45.

Here, the majority of the continuances were requested by defense counsel in order to properly prepare for trial. The four continuances requested by the State, all based on witness unavailability, are understandable given multiple delays over almost two years and the difficulty of coordinating several witnesses over indefinite and extended periods of time. Accordingly, this factor weighs against finding that the trial court violated Moulton's right to a speedy trial.

c.      Defendant's assertion of their right

For the third *Barker* factor, Moulton acknowledges that when "a defendant asserts the right to speedy trial but his or her attorney seeks continuances to prepare for trial, this factor is neutral." Br. of Appellant at 45 (citing *Ollivier*, 178 Wn.2d at 839-40). Moulton also notes that a trial court "may grant continuances for good cause, even without the consent of the defendant." *Id.* However, despite these concessions, Moulton argues that his repeated objections should "weigh heavily" in favor of finding that the trial court violated his right to a speedy trial. Br. of Appellant at 46.

We agree that this factor is neutral where here, like in *Ollivier*, Moulton's defense counsel sought a majority of the continuances to properly prepare for trial. 178 Wn.2d at 838-40. To the extent Moulton objected to the State's requested continuances, this factor is outweighed by other

considerations, including the State's need to reschedule witness testimony multiple times to accommodate defense counsel's requested continuances.

### d. Prejudice to defendant

Under the fourth *Barker* factor, a defendant may be prejudiced by delay because of (1) oppressive pretrial incarceration, (2) the defendant's anxiety and concern, and (3) the possibility that the defendant's dimming memories and the loss of exculpatory evidence will impair the defense. *Ross*, 8 Wn. App. 2d at 955.

Defendants generally must show actual prejudice to establish a violation of their right to speedy trial. *Id.* at 956. "However, prejudice will be presumed when the delay results from the State's negligence and there has been 'extraordinary delay.'" *Id.* (quoting *Ollivier*, 178 Wn.2d at 842). Courts have generally presumed prejudice only in cases where the delay was at least five years. *See Ollivier*, 178 Wn.2d at 842-43. And in *Ollivier*, the court held that a delay of 23 months was not sufficient to establish actual prejudice on its own. *Id.* at 821, 843.

Moulton argues that the length of the delay in this case creates a strong presumption of actual prejudice. Moulton contends that "sufficiently unjustified and egregious delay can warrant relief even in the absence of specifically identifiable prejudice, because excessive delay compromises the reliability of a trial in ways that cannot be proven or even clearly identified." Br. of Appellant at 46.

Here, Moulton's trial was delayed for almost 21 months, less than the defendant's in *Ollivier*. And like in *Ollivier*, Moulton's defense counsel requested a majority of the continuances because he needed time to properly prepare in order to adequately represent Moulton at trial. This delay is not sufficient to establish prejudice on its own.

Additionally, Moulton was not incarcerated before trial, which weighs against a finding of prejudice. Generally, a defendant's anxiety and concern are "'always present to some extent, and thus absent some unusual showing [are] not likely to be determinative in defendant's favor.'" *Ollivier*, 178 Wn.2d at 845 (quoting WAYNE R. LAFAVE, JEROLD H. ISRAEL, NANCY J. KING & ORIN S. KERR, CRIMINAL PROCEDURE § 18.2(e) (3d ed. 2007) (footnotes omitted)). Moulton has not made a showing that he experienced any unusual anxiety or concern due to the delay of his trial. The primary evidence in this case was OJ's initial statements to her mother and the forensic interviewer. The trial court determined that OJ was unavailable as a witness at trial, so the loss of her memory due to trial delay was not relevant. A recording of the forensic interview was played at trial, so concerns about memory of the forensic interviewer were not relevant. And OJ's mother testified consistently with the statements she initially made to the police about what OJ disclosed.

Accordingly, Moulton has not demonstrated actual prejudice due to the delay, and this factor weighs against finding that the trial court violated Moulton's constitutional right to a speedy trial.

### e. Conclusion

Considering all the *Barker* factors, the trial court did not violate Moulton's constitutional right to a speedy trial by granting continuances delaying his trial.

### C. CrR 3.3

Moulton also argues that the trial court violated his right to a speedy trial under CrR 3.3 and his conviction should be remanded for dismissal in accordance with this rule. Moulton acknowledges that under CrR 3.3, "a motion for continuance made by defense counsel is generally

presumed to waive objection on behalf of the defendant." Br. of Appellant at 49. However, he argues that "this rule is not limitless" and the trial court failed to provide an "articulable, adequate basis" for continuances outside of the CrR 3.3 deadline. *Id.* at 49, 50.

Under CrR 3.3(b)(2)(i), a defendant not held in custody pending trial must be tried within 90 days of their arraignment. A trial court may continue trial based on a motion from either party if the continuance "is required in the administration of justice" and the defendant's case will not be prejudiced. CrR 3.3(f)(2). Under the rule, a motion for a continuance "by or *on behalf of* any party waives that party's objection to the requested delay." *Id.* (emphasis added). We review a trial court's decision to grant or deny a motion for a continuance for an abuse of discretion. *Ollivier*, 178 Wn.2d at 822-23.

In *Ollivier*, the Washington Supreme Court held that because Ollivier's defense counsel sought the continuances, any of Ollivier's objections to those continuances were waived. *Id.* at 824. Ollivier also argued that the trial court granted the continuances without sufficient investigation or reason. *Id.* at 822. However, the court concluded that the trial court did not abuse its discretion by granting continuances where defense counsel requested additional time in order to properly prepare for Ollivier's defense. *Id.* at 824-25.

Moulton cites *State v. Saunders*, 153 Wn. App. 209, 220 P.3d 1238 (2009), as a case where this court "dismissed a conviction for a CrR 3.3 violation despite defense counsel's agreement to continuances beyond the speedy trial period." Br. of Appellant at 49-50. However, *Ollivier* distinguishes *Saunders*:

> In *Saunders,* three continuances at issue were granted that the Court of Appeals found to be unsupported by convincing and valid reasons. Indeed, the continuances were granted to permit ongoing plea negotiations over the defendant's objection and contrary to his desire to go to trial. As the State points out in the present case,

whether to plead guilty is an objective of representation controlled by the defendant and not a matter of trial strategy to achieve an objective. In contrast, under CrR 3.3, counsel has authority to make binding decisions to seek continuances. *Saunders* is unlike Mr. Ollivier's case because here the continuances were sought to enable defense investigation and preparation for trial.

*Ollivier*, 178 Wn.2d at 824-25 (footnote omitted) (citations omitted).

This case is more like *Ollivier* than *Saunders*. Moulton's counsel requested a majority of the trial continuances in this case, sometimes over Moulton's objections. Defense counsel provided a variety of reasons for these continuances, including difficulty scheduling witness interviews, inability to properly prepare for Moulton's defense in the required time period, and delay from other trials. Under CrR 3.3(f)(2), Moulton's defense counsel's motions waived any of Moulton's objections to postponement of his time for trial date. Like in *Ollivier*, and unlike in *Saunders*, Moulton's defense counsel moved for continuances to enable an adequate defense and preparation for trial.

As explained above, the State only requested four continuances in the course of Moulton's proceedings, and only three of these resulted in an extension of the time for trial date. The State supported each of its requests with reasons that justified delay for the "administration of justice." CrR 3.3(f)(2); *see State v. Nguyen*, 68 Wn. App. 906, 914, 847 P.2d 936 (1993) ("The unavailability of a material State witness is a valid ground for continuing a criminal trial where there is a valid reason for the unavailability, the witness will become available within a reasonable time, and there is no substantial prejudice to the defendant."). This is particularly true where defense counsel repeatedly requested continuances and the State had to coordinate the availability of multiple witnesses for almost two years. Additionally, for each of the three continuances that the State requested and that delayed the time for trial date, Moulton's defense counsel stated that

No. 58963-0-II

Moulton's defense would not be prejudiced by the delay. Accordingly, the trial court did not err by granting the State's requested continuances under CrR 3.3(f)(2), and Moulton's trial does not require dismissal on appeal.

CONCLUSION

We affirm Moulton's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

____, P.J.

CHE, J.

31